**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTRON CANNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-06982 |
| | ) | |
| GENERAL SUPPLY & SERVICES, INC, | ) | |
| d/b/a GEXPRO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, United States District Judge:

Before the Court is Defendant General Supply & Services, Inc. ("Gexpro")'s motion for summary judgment in this employment discrimination case. (R.30). For the reasons set forth below, the Court grants Defendant's motion and dismisses this case with prejudice.

## BACKGROUND

### I.       Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). "The non-moving party must file a response to the moving party's statement, and, in the case of any

disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citation omitted); *see also* L.R. 56.1(b)(3)(B). Local Rule 56.1(b)(3)(C) "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement . . . of any additional facts that require the denial of summary judgment.'" *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (citation omitted). "The obligations set forth by a court's local rules are not mere formalities." *Zuppardi v. Wal–Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014). District courts have discretion, therefore, "to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required." *Id.*; *see also Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) ("This Court has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1").

Here, Plaintiff Antron Cannon ("Cannon") filed both a Local Rule 56.1(b)(3)(B) response and Local Rule 56.1(b)(3)(C) statement of additional facts. (R.36, R.37). Several of Cannon's Local Rule 56.1(b)(3)(B) responses, however, do not comply with Local Rule 56.1.[1] In particular, Cannon's responses to ¶¶ 5-12, 14, 16-17, 19-24, 26-27, 29, 32, 34-37, 39-42, and 44-57 either: (i) do not "admit or deny facts *as presented* in the moving party's statement[,]" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) (emphasis added); (ii) do not "provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court[,]" *see id.*; and/or (iii) make reference to legal argument. *See id.* These responses, in other words, fail to meet the standard set forth in Local Rule 56.1. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000) ("The

---

[1] Cannon is represented by counsel, has filed several other employment discrimination lawsuits in this District, and performs legal research for an "attorney friend" of his. He should, in short, be familiar with the local rules. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶¶ 47-57).

statement is so full of argument, evasion, and improper denials that it defeats the whole point of Local Rule [56.1]—to identify just what facts are actually in dispute"); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes") (citation omitted). Accordingly, the Court deems the underlying statements of fact uncontested. The Court, nonetheless, has reviewed Cannon's specific record citations where he offered them. The relevant facts are as follows.

## II. Cannon's Employment at Gexpro

Cannon, who is black, began working at a Naperville-based Gexpro warehouse through a temporary staffing agency in May 2010. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶¶ 8, 10-12). In that capacity, he "picked [products], loaded trucks, whatever they asked [him] to do." (*Id.* (citing R.31-2, Cannon Dep. Tr. at 70-74, 83-84)). During the course of that employment, Cannon spoke with Gexpro's warehouse supervisor, Joe Anderson ("Anderson"), about becoming a regular employee. (*Id.*). With Anderson's support, Gexpro hired Cannon as a permanent employee beginning July 18, 2011. (*Id.*; *see also* R.31-3, Anderson Dep. Tr. at 177-79 ("I was really pushing hard for it")). Cannon continued to work in the warehouse. (*Id.*; R.31-2, Cannon Dep. Tr. at 74 ("[Q]. I think you said it was doing the same job as what you were doing as a temp? [A]. Yes")).

While at Gexpro, Cannon "worked in almost every zone," although Anderson "usually" assigned him to Zone 2, which involved moving "large" and "heavy" products. (R.31-2, Cannon Dep. Tr. at 83-84; *see also* R.31-11, 2011 Performance Evaluation (observing, "because I have learned all different jobs of the warehouse I can be placed where needed if we are short")). In addition to Cannon, two other black male pickers primarily worked in Zone 2. (R.37, Cannon

Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 1; R.39-1, Cannon Dep. Tr. at 90-94). Those two men eventually left Gexpro's employment, at which point Cannon contends that he, alone, worked a primary assignment in Zone 2. (*Id.*). A white male picker named Scott Lanig ("Lanig"), who had diabetes and was "sickly," would "sometimes" work in Zone 2, as would a Pakistani male temporary worker. (*See id.*; R.31-2, Cannon Dep. Tr. at 106-07). In addition, another white male employee, Ray Hughes ("Hughes"), spent approximately 70% of his time in Zone 2 as a picker. (R.31-35, Hughes Decl. ¶¶ 6-7, 13-14). Two female pickers, meanwhile, primarily worked in Zone 1. (R.31-3, Anderson Dep. Tr. at 33-35). One of them, Laurie Bulger, was white. (*Id.*). Zone 1 contained the smaller items that fit in bins, while Zone 2 usually contained the larger items and pallets with items packaged in bulk. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 6). As Cannon acknowledged, some warehouse assignments required "more lifting or more strength than others[.]" (R.31-2, Cannon Dep. Tr. at 120). At the time, Cannon had the physical strength to work within Zone 2, although he experienced on-the-job pain. (*Id.* at 110-12, 96-97). He did not file a workers' compensation claim while at Gexpro. (*Id.*).

In Cannon's 2011 performance evaluation, Anderson noted, "Antron has performed well in many areas of his job. His picking productivity in zone 2 . . . stands out as a leader . . . In addition to his productivity, Antron has also been very helpful to the team by developing best practices for picking product effectively." (R.31-11, 2011 Performance Evaluation). Cannon discussed this written evaluation with Anderson during an in-person meeting around April 2012. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 16; R.32-2, Cannon Dep. Tr. at 95-99 ("I had this performance review maybe a couple weeks before I stopped working")). This document—which incorporates feedback from both Cannon and Anderson—does not memorialize any written complaint or concern from Cannon. (*Id.*).

Between 2009 and 2011, Gexpro downsized its warehouse staff from 30 to 18 employees, including Cannon. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 7). The remaining warehouse staff, as a whole, included five white males (including Anderson), five black males, five white females, one mixed race female, one Asian male, and one Asian female. (*Id.* ¶ 5). Two black staff members and one Asian staff member received a promotion either during or shortly after Cannon's tenure at Gexpro. (*Id.* ¶ 17).

## III.    Cannon's Verbal Complaints

According to Cannon, sometime before the April 2012 meeting with Anderson, he began verbally complaining about being treated like a "horse" and a "slave" in Zone 2. (R.31-2 and R.39-1, Cannon Dep. Tr. at 96-97, 102-03, 108-10, 120-23 ("It's like you're slaving me and you let… everybody else do all the easy work")). When asked what, specifically, he said to Anderson, Cannon recalled, "I said I feel like it's because I'm black and you won't move – let me move around but you move [Scott Lanig and Ray Hughes] around." (*Id.* at 103, 107-10, 122-23 ("And I constantly told him . . . When I injured myself, when I injured my feet, when I had pulled the groin muscle I had told him")). The timing of this race-based complaint, however, is not clear. (*Id.*). Moreover, as Cannon acknowledged, the terms "horse" and "slave" were his own expressions. No member of Gexpro management, including Anderson, used those terms when referring to Cannon. (*Id.* at 123, 132).

According to Anderson, Cannon's verbal complaints did *not* concern his race. (R.31-3, Anderson Dep. Tr. at 29, 172-73, 180-81 (testifying that the complaint was, "I don't want to work in Zone 2")). Anderson disputes Cannon ever telling him that "he felt he was being discriminated against because of his race" or that "he was being treated like a slave." (*Id.*). Anderson testified that Cannon and other employees complained "all the time" about their

workload and work assignments, but that reassignment opportunities were "rare." (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 19).[2] As Anderson testified, "I assigned people to where the work was… You had you put them where they performed best." (R.31-3, Anderson Dep. Tr. at 88-89; *id.* at 38 ("I needed the work to get done. Without [Cannon] in Zone 2, I really didn't have, you know, very many other people to assign to that role")). Anderson, accordingly, placed Cannon in Zone 2. (*Id.* at 178 ("He's a big guy . . . A pretty strong looking guy"); *id.* at 208-10 ("I divided the workload up . . . based on the physical capabilities of the people performing the jobs"); R.31-32, Witness Interview Notes ("[Cannon] was assigned to Zone 2 because he was a larger gentleman who was able to lift the heavy equipment. He was performing that job before he was brought in full time, [and] then he gets full-time [employment] and it's an issue")). Anderson believed all of Cannon's complaints concerned workload and work assignments, not racial discrimination. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 23). Four of Cannon's co-workers, including three black co-workers, attested that Cannon did not mention or complain about racial discrimination to them, nor did they witness or experience any racial discrimination by Anderson. (*Id.* ¶ 22).

## IV.     May 2, 2012 – May 4, 2012

On May 2, 2012, Anderson issued a written "Notice of Unacceptable Behavior" to Cannon related to an April 30, 2012 incident during which Cannon mislabeled six reels of wire. (R.31-13 (the "May 2 Notice"); R.31-3, Anderson Dep. Tr. at 181-84). The May 2 Notice recited, in part:

> On several occasions prior to this incident, the associate was instructed by the warehouse manager to pick this type of material in a manner that accounted for each package, or 1 load label for each reel in this case . . . By not following instruction, we are now unable to dispute the customer's claim, and the material will need to be replaced. Total cost to

---

[2] Anderson recalled once speaking to Cannon about a potential reassignment to the "Wire Department." Cannon, however, denied receiving this offer of reassignment. (R.36, Cannon Rule 56.1(b)(3)(B) Stmt. Facts ¶ 15).

the company for this error is in excess of $3,000.00 . . . This document serves as notice to the associate that this type of behavior is unacceptable. The associate was trained on more than 1 occasion to perform this task in the correct manner. Any further instances of this type of incident will be considered insubordination and the penalty for such will be termination of employment.

(*Id.*). Indeed, Anderson had previously instructed Cannon not to engage in such labeling practices. (R.39-2, Anderson Dep. Tr. at 84-86). According to Cannon, though, another warehouse supervisor—albeit junior to Anderson—had approved this practice. (R.31-2, Cannon Dep. Tr. at 133-36).

On May 3, 2012, Anderson conducted a warehouse department meeting. According to Cannon, during that meeting, "I went off and told them that, you know, how [Anderson] was working me, it was crazy. You know, I told him you could run a horse into the ground, you can't even run a horse like you run me. Sooner or later a horse is going to go lame and that's what you're doing to me." (R.31-2, Cannon Dep. Tr. at 140-43). Although Cannon now attests that he "complained of racial discrimination and retaliation" during this meeting, (R.39-5, Cannon Aff. ¶ 11), his deposition testimony does not support such a broad statement. (R.31-2, Cannon Dep. Tr. at 142 ("[Q]. Did you use the 'working like a slave' or 'slaving' comment during that meeting? [A]. No, I don't think so, no")). Anderson then asked Cannon to leave and wait in his office. (*Id.* at 143). As Anderson testified, "basically [Cannon] became very argumentative and belligerent towards his co-workers in the meeting, and I actually had to remove him from the meeting because he was disrespectful in many ways." (R.31-3, Anderson Dep. Tr. at 143-44). Cannon did not "talk about being treated like a slave" or "bring up race at all." (*Id.* at 186-88). Three of Cannon's co-workers present at that meeting, including two black co-workers, Curtis Coleman and Claude Turner, attested that Cannon swore, talked over Anderson, and acted aggressively. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 27). Coleman and Turner further attested that

Cannon "never complained about or mentioned race discrimination[,]" including during the May 3, 2012 department meeting. (R.31-34, Coleman Aff. ¶ 12; R.31-37, Turner Aff. ¶ 5).

On May 4, 2012, Cannon met with Anderson and Gexpro's District Operations Manager, Julie Massey ("Massey"). (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 28). The goal of that meeting "was to counsel Cannon and gauge his interest in working at Gexpro – not to terminate him." (R.37, Cannon Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 5). Prior to the meeting, Gexpro's human resources representative, Laura Whalen ("Whalen"), had spoken with Anderson and Massey about Cannon, telling them to engage in a "conversation" with Cannon "to set out the expectations and hopefully come to an agreement in terms of, you know, going forward with . . . his behavior." (R.31-4, Whalen Dep. Tr. at 87-88). The meeting, however, "didn't go well." (*Id.*). According to Cannon, Anderson had a "little sheet of paper with four or five" discussion points on it, including Cannon's unhealthy relationships with peers, attendance issues, unacceptable work practices, and disruptive behavior. (R.31-2, Cannon Dep. Tr. at 149-160; *see also* R.31-15, Meeting Outline). Anderson was "very combative" and accused Cannon of falsifying records. (*Id.*). Cannon, in turn, admitted that he, too, was "argumentative" because he was "standing up" for himself. (*Id.*). He told Anderson and Massey, "This right here is how you treat me. You treat me like a slave[.]" (*Id.* at 151; R.31-3, Anderson Dep. Tr. at 228 ("It was very antagonistic")). Massey, in turn, was "very nice, very understanding" and told Cannon he could leave for the day, with pay, and then they could talk again Monday morning about his work behavior or whether he wanted to quit. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 30; R.31-6, Massey Dep. Tr. at 100-01 ("[Q]. So you left the meeting on May 4 telling Antron to think about it and come back on Monday. [A]. Correct . . . The understanding was, on Monday, if Antron came to work, that the three of us would sit down")).

## V.    May 7, 2012 – May 10, 2012

Cannon did return to work the following Monday, May 7, 2012.  (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 31).  After he punched in, however, Anderson "gave [him] a little sheet that said [he] was terminated."  (R.31-2, Cannon Dep. Tr. at 178; R.12, Compl. at ¶ 10 ("Cannon reported to work and after a lengthy discussion with Joe Anderson was told that he was discharged")).  Cannon then turned around and walked out of the warehouse, without speaking to Massey.  (R.31-2, Cannon Dep. Tr. at 185-87).  According to Massey, "[t]he next thing I knew, Joe [Anderson] came into my office and said Antron no longer works here."  (R.31-5, Massey Dep. Tr. at 33-36 ("[Q]. And what did Joe tell you?  [A]. They didn't agree on the talking points")).  After speaking with Anderson, Massey thought Cannon's departure was "a mutually agreed-upon decision" wherein Cannon formally "quit" because he "didn't want to do the [Zone 2] work that we had available for him."  (*Id.* at 99, 102-06).  Whalen—Gexpro's human resources representative—believed the same.  (*Id.* at 105; R.31-4, Whalen Dep. Tr. at 90-91, 132-34 ("And whether . . . I was under the impression that he quit, or whether Joe terminated him, either way, [Cannon] didn't agree with the terms of his employment")).  Anderson, for his part, could not recall the specifics of his May 7, 2012 conversation with Cannon.  (R.31-3 and R.39-2, Anderson Dep. Tr. at 112-13, 123 ("I remember terminating him")).

According to Whalen, this "was a unique situation" insofar as Anderson did not have a formal "stamp of approval" to terminate Cannon on May 7, 2012.  (R.31-4 and R.39-4, Whalen Dep. Tr. at 59-61, 64-68, 93, 100-01, 103-04, 109, 111 ("It was not the direction that we gave")).[3]  Ultimately, however, both Whalen and her supervisor reviewed and approved the termination.  (*Id.*).  Gexpro issued a termination letter to Cannon on May 10, 2012.  (R.31-16

---

[3]  *See also* R.39-4, Whalen Dep. Tr. at 143 ("[I]t was not handled the way we would have wanted it handled, no"); R.31-6 and 39-3, Massey Dep. Tr. at 117-18, 147 ("I agree that the way the Termination Letter was handled by Joe Anderson was not handled appropriately.  But beyond that, we didn't do anything wrong")).

(the "May 10 Termination Letter"); *see also* R.31-31, May 14, 2012 E-mail from Whalen to

Anderson ("Joe – Since [Cannon] was not authorized to be terminated until 5/10 he will be paid

through 5/10")). The May 10 Termination Letter stated, in part: "Following the disciplinary

action on May 2, 2012, you continued to be disrespectful to peers and insubordinate to the

Warehouse Supervisors . . . We went through a detailed account of your improvement needs [on]

Friday, May 4, 2012 and you did not agree to make the necessary improvements." (R.31-16; *see

also* R.31-4, Whalen Dep. Tr. at 59-61 (explaining the "individual circumstances" of this

termination decision); R.31-3, Anderson Tr. at 128 ("I pushed very hard to have [Cannon] hired

on as a full-time employee . . . towards the end of his employment with us, it was shocking to me

that he was exhibiting such poor behavior")). Whalen confirmed that Gexpro did not have a

"progressive discipline" policy—that is, escalating "levels" of review and disciplinary action

prior to termination—although it did develop "performance improvement plans" ("PIP") for

some employees. (R.31-4 and R.39-4, Whalen Dep. Tr. at 31, 51-52, 68-70 ("A PIP was used

more for actual performance issues"); R.39-2 Anderson Dep. Tr. at 157 (testifying that he

received a PIP)).[4] Cannon does not recall receiving any termination letter from Gexpro. (R.39-

5, Cannon Aff. ¶ 15).

## VI.     ADR and EEOC Proceedings

After his termination, Cannon initiated Alternate Dispute Resolution ("ADR")

proceedings. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 37). In his Level I ADR submission dated

---

[4] Anderson, however, opted out of PIP participation. (*Id.*). He instead accepted a separation package from Gexpro. When he later spoke with the EEOC about Cannon's case, he told the investigator, "I pushed hard for [Cannon] to be a full-time employee but I feel like he screwed me . . . I feel that I was let go because of Cannon . . . I didn't deserve that from him[.]" (R.31-32, Witness Interview Notes; R.39-2, Anderson Dep. Tr. at 104 ("My statement to the EEOC was emotionally based . . . at the time I spoke to the EEOC, you know, I felt that perhaps my expeditious removal from the company was in some way related to this case")). Whalen was not willing to state that Anderson's removal from Gexpro was "because of the way he handled the Antron Cannon matter[.]" (R.39-4, Whalen Dep. Tr. at 115 ("ultimately, I mean, it was not just a result of this particular situation")).

June 5, 2012, Cannon stated that he was "wrongfully terminated" for "complaining about unfair work practices," including the work being "unfairly distributed" among the warehouse staff, with him "left alone to do a two person job" and "not being moved around" while "[Laurie] and Scott [were] allowed to put away the easy things." (R.31-17).

During a subsequent ADR meeting with Whalen and Massey, Cannon was "not quite sure" whether he used the word "race" or "discrimination" in describing his claim. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 39). When asked at his deposition, "You didn't say race discrimination, did you?" Cannon responded, "I think I said unfair work practices" stemming from being "in Zone 2" and not "moved around." (R.31-2, Cannon Dep. Tr. at 201-02, 205-06). Cannon now contends that his ADR claim "revolved around being the only African American assigned to work primarily in Zone 2 and that that necessarily raised the issue of race discrimination and retaliation based on his work circumstances." (R.39-5, Cannon Aff. ¶ 21). Whalen, however, did not interpret his claim as a racial discrimination charge. (R.31-4, Whalen Dep. Tr. at 138-41). As she explained, "Never did [Cannon] tell me in our discussions that he felt like it was a race issue. He told me he felt like he was being overworked. Scott Lanig, who, yes, does happen to be a white employee, [had] recently returned from medical leave, so I understand why Scott Lanig would not be assigned to the bulk area for his full work assignment . . . So no, I did not assume it was a race issue simply because one employee was black and one employee was white." (*Id.*). Massey testified similarly, acknowledging, "I know Scott Lanig is white, yes. But, again, that had nothing to do with what we had talked about previously. We were only talking about the work in Zone 2. Race had not entered any of the conversations." (R.31-6, Massey Dep. Tr. at 141-43).

On July 2, 2012, Whalen issued a Level II ADR letter to Cannon, advising that Gexpro had reviewed his claim and had "concluded that the termination of [his] employment was appropriate[.]"  (R.31-18).  Cannon then filed his Level III ADR submission, which included the same letter that he had submitted at Level I, plus five extra pages.  (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 40; R.31-19).  Those extra pages did not reference "race discrimination," but they did reference the "Equal Opportunity Act of 2010" and the "American Civil Law Act of 1964." (*Id.*).  After reviewing these supplemental materials, Gexpro affirmed its decision.  (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 41; R.31-20; R.31-4, Whalen Dep. Tr. at 143-44 ("ultimately we reviewed everything and decided to uphold the termination")).

Cannon subsequently completed an EEOC Intake Questionnaire, alleging both race discrimination and disability discrimination, the latter of which he did not pursue.  (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 42; R.31-21).  On August 20, 2012, he signed an EEOC charge of race discrimination and retaliation.  (R.31-22).  In a subsequent letter to the EEOC, Cannon clarified the basis for his charge, stating:  "In my May 4, 2012 meeting with Joe Anderson and Julie Massey, I told Joe Anderson that I felt that he was slaving me.  Making me do all the hard work and letting the white employees do all of the easy work when we [were] shorthanded on a daily basis.  In my ADR letter[,] when I spoke about unfair work practices this is what I was talking about."  (R.31-29, June 9, 2014 Ltr. to EEOC).

On August 10, 2015, after receiving a Notice of Right to Sue from the EEOC, Cannon commenced this action.  (R.1).  The First Amended Complaint alleges (i) unlawful termination based on race under Title VII of the Civil Rights Act of 1964, (ii) unlawful termination based on race under 42 U.S.C. § 1981, (iii) unlawful retaliation under Title VII, and (iv) unlawful retaliation under § 1981.  (R.12).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of *some* alleged factual dispute will not defeat summary judgment." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 247-48). In determining summary judgment motions, courts "must view the record in the light most favorable to the non-moving party and give the benefit of reasonable inferences to the non-moving party." *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts"). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).

## ANALYSIS

### I.      Race Discrimination (Counts I and II)

The Court first addresses Cannon's race discrimination claims under Title VII and Section 1981. The same analysis applies to both claims. *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016); *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

A.      **Applicable Legal Principles**

In employment discrimination cases, courts must evaluate the evidence "as a whole" to determine whether such evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In other words, "the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014). Here, "[t]he core issue is whether [Cannon] has offered evidence that would allow a reasonable jury to infer that he would not have been fired if he were not African American and everything else remained the same." *Lane*, 835 F.3d at 695.

Although the parties discuss the "direct" and "indirect" methods of proof and the "mixed-motive" theory, *see Grigsby v. LaHood*, 628 F.3d 354, 358-61 (7th Cir. 2010) (describing all three), the Seventh Circuit has eschewed reliance on formulaic methods of proving race discrimination. *See Williams v. Office of Chief Judge of Cook Cty. Illinois*, 839 F.3d 617, 626 (7th Cir. 2016) ("We recently discarded the direct and indirect methods of proof for retaliation claims, and held that a plaintiff can surmount summary judgment if a reasonable factfinder could conclude that the plaintiff's race caused the discharge") (citing *Ortiz*, 834 F.3d at 764-65). Even though the Seventh Circuit confirmed the viability of the familiar, "burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)," *see Ortiz*, 834 F.3d at 766, Cannon does not purport to rely on the *McDonnell Douglas* framework in this case.[5] Accordingly, the Court "look[s] past the ossified direct/indirect

---

[5] Cannon summarily argues in a footnote that he "satisfies the *McDonnell Douglas* approach as well," but he offers no analysis on that issue. (R.35, Response Br. at 8 n.1). To prove discrimination under the *McDonnell Douglas* framework, a plaintiff must "make a prima facie case with evidence that: (1) [plaintiff] is a member of a protected class; (2) [plaintiff] met [employer's] legitimate job expectations; (3) [plaintiff] suffered an adverse employment

paradigm to address the critical question, which is simply whether a reasonable jury could infer prohibited discrimination[.]"  *See Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 899 (7th Cir. 2016) (citing *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013)).

**B.  Analysis**

Here, Cannon has not set forth sufficient evidence that would allow a reasonable jury to infer race discrimination, "even when we give him the benefit of conflicts in the evidence and reasonable inference[s] in his favor."  *See Lane*, 835 F.3d at 698.

**1.  There Is No Direct Evidence of a Discriminatory Animus**

As an initial matter, Cannon "does not have evidence directly indicating that [Anderson] or any other decision-maker was motivated by racial animus."  *Lane*, 835 F.3d at 695; *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2007) ("Stated differently, direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus") (citation omitted).  Cannon does not dispute this fact.

**2.  There Is Insufficient Circumstantial Evidence of a Discriminatory Animus**

Cannon relies, instead, upon circumstantial evidence.  (R.35, Response Br. at 5-8, 10-11 (citing *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)).  In particular, he relies on three factual points to support an inference of discrimination, as follows.

**a.  The Identity of Zone 2 Workers**

Cannon's current theory of race discrimination is that he was "the only African American assigned to Zone 2 on a nearly exclusive basis," while Caucasian employees worked in "easier"

---

action; and (4) similarly situated employees outside of the protected class were treated more favorably.  If [plaintiff] can establish a prima facie case, then the burden shifts to [employer] to give a legitimate, nondiscriminatory reason for firing [plaintiff].  If [employer] does so, then the burden shifts back to [plaintiff] to offer evidence that [employer's] reason is mere pretext for unlawful discrimination."  *See Chaib*, 819 F.3d at 342 (citation omitted).

zones.  (R.39-5, Cannon Aff. ¶¶ 3, 4, 6, 17, 19-21).  "Simply being a member of a protected class, without something more to link that status to the action in question," however, "is not enough to raise a reasonable inference of discriminatory animus."  *Cole*, 838 F.3d at 900.  Cannon has not identified, for example, any "ambiguous statements oral or written," or any "behavior toward or comments directed at other employees in the protected group," suggestive of discriminatory motives.  *See Hossack*, 492 F.3d at 862 (identifying "three types of circumstantial evidence of particular relevance when establishing the inference of intentional discrimination in Title VII cases"); *contra Ortiz*, 834 F.3d at 763 ("Ortiz also tells us that Krikava and Lass subjected him to a barrage of ethnic slurs").

Furthermore, while Cannon identifies two other black males who, at some point, worked a primary assignment in Zone 2, this identification alone does not constitute evidence that similarly-situated, non-black employees "received systematically better treatment[.]"  *See Hossack*, 492 F.3d at 862.  As an initial matter, Cannon has not attempted to establish the material comparability between himself and "similarly-situated" non-black employees.  *See Blasdel v. Nw. Univ.*, 787 F. Supp. 2d 759, 773 (N.D. Ill. 2011), *aff'd*, 687 F.3d 813 (7th Cir. 2012).[6]  As to the "treatment" element of this undeveloped argument, Cannon overlooks record evidence that (i) white male employees were assigned to work, at least in part, in Zone 2, and (ii) other black male employees were not assigned to work in Zone 2 at all.  Cannon also ignores that Anderson both hired him—"pushing hard for it"—and fired him, rendering it "unlikely that [Anderson] had a discriminatory motive."  *See Harris v. Warrick Cty. Sheriff's Dep't*, 666 F.3d

---

[6] His own deposition testimony establishes that the likeliest individual comparator—Scott Lanig—had diabetes and was "sickly."  *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) (the similarly-situated requirement normally "entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them"); *Williams*, 839 F.3d at 626 ("to prevail by showing differential treatment of a similarly situated employee, a plaintiff must identify a comparator who is directly comparable to her in all material respects . . . to eliminate other possible explanatory variables") (citation omitted).

444, 449 (7th Cir. 2012) (although not dispositive, the "same-actor" inference may serve "as a convenient shorthand for cases in which a plaintiff is unable to present sufficient evidence of discrimination") (citation omitted); *Blasdel v. Nw. Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) ("It is just something for the trier of fact to consider"). In short, "[a]bsent any evidence suggesting that discrimination motivated work distributions, the mere fact that an employee . . . had a heavier workload than [his] co-workers" does not amount to unlawful employment discrimination. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007). As discussed herein, Cannon has failed to offer such evidence.

### b.    The Timing of Cannon's Termination

Cannon next questions the "suspicious timing" of his termination, which came (i) mere weeks after his "glowing" 2011 Performance Review—which made no reference to paperwork falsification or attendance issues—and (ii) only five days after his first "documented" warning. Cannon ignores, however, the sequence of uncontested events leading up to the May 7, 2012 termination, including: (i) the May 2 Notice, advising that he had been instructed "[o]n several occasions prior to this incident" not to engage in such mislabeling practices, and warning that "[a]ny further instances of this type of incident" will merit termination; (ii) the May 3 warehouse department meeting, wherein Cannon behaved in an aggressive and disruptive manner; and (iii) the May 4 meeting with Massey and Anderson, wherein Cannon became "argumentative" in a discussion aimed at addressing his workplace behavior. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶¶ 24-29). In addition, Cannon has identified no evidence that might lead a juror to infer that Anderson would have tolerated such misconduct by a non-black employee.[7] *Contra Ortiz*, 834 F.3d at 766 (concluding, based on the plaintiff's submission of "depositions and declarations

---

[7] This inquiry is different from asking whether a warehouse supervisor junior to Anderson, such as Curtis Coleman, would have tolerated such conduct. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 24; R.39-5, Cannon Aff. at ¶ 15).

from other brokers, managers, and former employees," that a reasonable juror "might infer that, because of Ortiz's ethnicity, Werner's managers fired him for using techniques that were tolerated when practiced by other brokers").

In other words, absent additional evidence, there is nothing "suspicious" about praising Cannon's 2011 productivity and "best-practices" skills in mid-April 2012, while being concerned about a series of behavioral incidents in early May 2012. *See Venturelli*, 350 F.3d at 601 ("All that these statements show is that, in addition to its praise of Venturelli's work, ARC also offered some additional observations"). Moreover, even accepting as true Cannon's statement that Anderson was "hoping to set [him] off and cause an outburst" through "false accusations" and an "attendance diatribe" at the May 4 meeting, (R.35, Response Br. at 6-7), Cannon has failed to identify evidence raising a reasonable inference of racial animus on the part of Anderson—or any other Gexpro decisionmaker—as opposed to, if anything, an animus of personal acrimony. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Title VII protects against discrimination, not personal animosity or juvenile behavior") (citation omitted).

### c.      Gexpro's Failure to Use Progressive Discipline

Next, Cannon challenges Gexpro's failure to follow a progressive discipline policy, questioning why Gexpro terminated him—a black man—while offering a PIP to Anderson—a white man—and to other employees. (R.35, Response Br. at 6-8). While "[a]n employer's deviation from its stated procedures and policies provides circumstantial evidence of discrimination," *Blasdel*, 787 F. Supp. 2d at 771, here, Cannon "identifies no stated policy from which [Gexpro] could deviate." *See id.* To the contrary, it is undisputed that Gexpro did not have a progressive discipline policy. (R.32, Rule 56.1(a)(3) Stmt. Facts ¶ 34). Moreover, to the extent Gexpro did attempt to practice progressive discipline through the issuance of PIPs, such

practice was plainly discretionary, and not pursuant to any internal procedure. As the Seventh

Circuit has observed, "when a progressive discipline policy permits the employer to exercise

discretion in discharging an employee without exhausting all of the policy's steps, failure to

follow all of the steps does not suggest a discriminatory motive." *Long v. Teachers' Ret. Sys. of

Illinois*, 585 F.3d 344, 353 (7th Cir. 2009). Cannon's related argument—that Gexpro's failure to

offer him a PIP, while allowing Anderson a PIP, evidences race discrimination—fares no better.

Given the lack of a stated policy governing disciplinary issues, and the lack of meaningful

commonalities between Cannon and Anderson (including rank, duty, and performance), no

reasonable juror could infer prohibited discrimination on such basis.[8] *See Humphries*, 474 F.3d

at 405 (observing that there must be "sufficient commonalities on the key variables" to permit an

inference of discrimination); *Lane*, 835 F.3d at 696 ("The basic question is whether the situations

are similar enough, apart from the employees' races, to provide support for a reasonable

inference of discrimination"). Absent any meaningful evidence bearing on the issue of

intentional workplace discrimination, Cannon has failed to meet his burden of proof. *See Bass*,

746 F.3d at 841.

### 3. There Is Insufficient Evidence that Gexpro's Explanation for Cannon's Work Assignment Was Pretextual

In this case, Gexpro has offered a non-discriminatory reason for Cannon's primary work

assignment in Zone 2 – specifically, Anderson made such assignment based on Cannon's relative

physical strength as compared to other staff members, and based on the volume of customer

orders. Cannon, in turn, has offered no evidence that such reason was pretextual. *See Cole*, 838

---

[8] In addition, Cannon offers no evidentiary support for this argument, apart from his own affidavit (R.39-5, Cannon Aff. ¶ 25). In briefing, Cannon references the details of Anderson's PIP, but fails to identify where in the record (if at all) the Court may find such evidence. Paragraphs 34 and 44 of his Local Rule 56.1(b)(3)(B) response, meanwhile, do not comply with Local Rule 56.1 and, accordingly, the Court disregards them. (R.35, Response Br. at 8).

F.3d at 900; *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839 (7th Cir. 2009) ("If the employer honestly believed the reason it proffers for its employment decision, the reason was not pretextual"). Cannon's pretext arguments, instead, concern the circumstances of his departure from Gexpro. The Court addresses these arguments in detail below, after analyzing Cannon's retaliation claims (Counts III and IV).

## II. Retaliation (Counts III and IV)

### A. Applicable Legal Principles

A Title VII retaliation claim requires a plaintiff to prove (1) that he engaged in statutorily protected activity; (2) that his employer took an adverse employment action against him; and (3) that the protected activity and the adverse employment action are causally connected. *See Gracia v. SigmaTron Int'l, Inc.*, ---F.3d---, No. 15-3311, 2016 WL 6958643, at *4 (7th Cir. Nov. 29, 2016). This claim requires a showing of "but-for" causation. *Id.*; *see also Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (same). Courts apply the same standard to retaliation claims brought under Title VII and Section 1981. *See Humphries*, 474 F.3d at 403-04; *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008) ("We have previously acknowledged a 'necessary overlap' between Title VII and § 1981).

### B. Analysis

#### 1. Statutorily Protected Activity

Cannon's retaliation claim is that Gexpro discharged him "for opposing [its] discriminatory conduct." (R.12, Compl. at ¶¶ 22, 27). According to Cannon, Gexpro "fired [him] because of his race after he complained that he was being worked like a 'slave' and 'a horse' in the most difficult working zone[.]" (R.35, Response Br. at 5). Cannon has failed to explain, however, how his opposition constitutes "protected activity."

20

To prevail on a retaliation claim, "the plaintiff must have a sincere and *reasonable* belief that he is opposing an unlawful practice." *High Voltage*, 839 F.3d at 563 (emphasis in original). The reasonableness determination requires the Court "to ask whether the complained-of conduct entailed a motive that Title VII prohibits." *Id.* As explained above, the complained-of conduct in this case—assigning Cannon to the "bulk" zone, while allowing others to rotate through "easier" work zones—does not entail "a motive that Title VII prohibits." In other words, as examined above, no evidence suggests that Gexpro discriminated against Cannon because of his race in distributing work assignments and rotating pickers, apart from Cannon's subjective belief. This lack of evidence is fatal to both his discrimination claim and his retaliation claim. *See id.* ("Without evidence of a prohibited motive, Lord's belief that he was complaining about sexual harassment, though perhaps sincere, was objectively unreasonable").[9]

## 2. Causation

Even assuming that Cannon's complaints about work distribution were protected activity, he has not shown that he was fired *because of* those complaints. *See High Voltage*, 839 F.3d at

---

[9] In addition, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to claim protection under Title VII. *Cole*, 838 F.3d at 901. Here, Anderson, Massey, and Whalen each believed Cannon's complaints—being worked like a "horse" or a "slave" as a result of "unfair work practices"—to concern workload and work assignments, not racial discrimination. Similarly, four of Cannon's co-workers attested that Cannon did not complain about racial discrimination to them, and his written ADR submissions make no explicit mention of the matter. His workplace complaints, in other words, "had no overt connection to race." *Id.* Cannon, on the other hand, testified that he—at some point, the timing is unclear—stated to Anderson, "I feel like it's because I'm black and you won't move – let me move around but you move [Scott Lanig and Ray Hughes] around." (*Compare* R.39-1, Cannon Dep. Tr. at 103 *with id.* at 109-10). Given the conflicting testimony concerning Cannon's race-based complaint, the Court cannot conclude—contrary to Gexpro's suggestion—that Cannon's retaliation claim fails on this basis. The Court observes, however, that this limited deposition testimony does not support Cannon's generalized statement that he "regularly complained" to Gexpro managers about "being the only African American assigned to Zone 2," unlike "his white co-workers [Scott] Lanig and [Laurie] Bulger." (R.39-5, Cannon Aff. ¶¶ 6-7, 11, 20; *see also* R.35, Response Br. at 6 (recalling "numerous and ongoing verbal complaints of racial discrimination, unfavorable work assignments handed out to African-Americans rather than the Caucasians at the Gexpro warehouse")). Affidavits submitted in opposition to motions for summary judgment must set forth *specific facts* showing that there is a genuine issue for trial. *See McGowan v. Deere & Co.*, 581 F.3d 575, 580 (7th Cir. 2009); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998) ("A party cannot prevail on a motion for summary judgment by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony") (citation and quotation omitted).

563.  In this case, Cannon testified that he—at some point, the timing is unclear—stated to Anderson, "I feel like it's because I'm black and you won't move – let me move around but you move [Scott Lanig and Ray Hughes] around."  (*Compare* R.39-1, Cannon Dep. Tr. at 103 (not at the 2011 performance review) *with id.* at 109-10 (at the 2011 performance review)).  Given the unclear timing of Cannon's purported race-based complaint to Anderson—as opposed to any non-actionable, "general complaint about improper workplace practices[,]" *see Cole*, 838 F.3d at 901—he cannot avail himself of the causal inference created by "suspicious" timing.  *See Hitchcock*, 718 F.3d at 742 ("Occasionally . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible") (citation omitted).  Furthermore, while the "number and substance of Cannon's complaints of racial discrimination to Anderson" may be issues of fact, (R.35, Opposition Br. at 13), it is Cannon's burden to demonstrate "but-for" causation.  *Cf. Bass*, 746 F.3d at 841 ("It is *Bass*, the party with the burden of proof, who must present some evidence that would allow a rational jury to infer intentional discrimination by the District").  Cannon's opposition brief, in fact, does not distinguish between his discrimination claims and his retaliation claims, and relies on the same circumstantial evidence outlined above to support both theories.  As with his discrimination claim, however, Cannon has failed to present "sufficient evidence to permit a reasonable fact finder to conclude that [a] retaliatory motive caused the discharge[.]"  *High Voltage*, 839 F.3d at 563.  This is true even considering Cannon's pretext argument, to which the Court now turns.  *See Williams*, 839 F.3d at 626 ("We must consider evidence as a whole, rather than by asking whether any particular piece of evidence proves the case by itself").

## III.    The Insufficiency of Cannon's Pretext Argument Regarding His Termination

Here, Gexpro has offered a non-discriminatory justification for terminating Cannon – that is, for the above-discussed series of behavioral incidents throughout May 2-4, 2012.  In particular, Gexpro terminated Cannon after:  (i) the May 2 Notice, advising that he had been instructed "[o]n several occasions prior to this incident" not to engage in specific mislabeling practices, and warning that "[a]ny further instances of this type of incident" will merit termination; (ii) the May 3 warehouse department meeting, wherein Cannon behaved in an aggressive and disruptive manner; and (iii) the May 4 meeting with Massey and Anderson, wherein Cannon became "argumentative" in a discussion aimed at addressing his workplace behavior.  Cannon, in turn, must offer evidence that such justification was pretext – that is, "a lie, a phony reason[.]"  *See Hitchcock*, 718 F.3d at 737-38.  Absent evidence of pretext, Gexpro's "non-discriminatory justification . . . must be believed, which necessarily precludes liability under Title VII."  *Id.*

### A.    Gexpro's "Disparate Reasons"

Cannon's chief argument is that "various factions of Gexpro" have cited "disparate reasons" for his termination.  (R.35, Response Br. at 12).  According to Cannon:

> On Monday, May 7, 2012 . . . Anderson fired Antron Cannon without providing any explanation, engaging in any progressive discipline, or otherwise explaining his actions. Thereafter, Cannon was told on various occasions by [Massey and Whalen] that Cannon was terminated on different dates for differing reasons.  Ultimately, Cannon saw at his deposition a letter dated May 10, 2012 advising him that he was terminated as of May 10, 2012 without any explanation of Anderson's statements on May 7, 2012 or as to why Cannon was not allowed on the premises to report for work between May 7 and May 10.

(Response Br. at 2-3).  Under Seventh Circuit precedent, an employer's "shifting explanations" for a termination decision may be "sufficiently inconsistent or otherwise suspect" so as to create a "reasonable inference that they do not reflect the real reason" for the decision.  *See Hitchcock*,

718 F.3d at 738. "[A] showing of pretext alone is not enough," however, as "the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Id.* at 740; *see also Lane*, 835 F.3d 691 at 697 (observing that, while "an employer's dishonesty in defending or explaining an employment decision can support an inference of illegal discrimination[,]" a reasonable jury could not "go from [a] factual discrepancy to an inference of racial bias" absent "further circumstantial evidence of unlawful discrimination").

Cannon's "disparate reasons" theory is not as clear as the one advanced in *Hitchcock*, where the Seventh Circuit "count[ed] at least four potentially different explanations given for [the plaintiff's] firing." 718 F.3d at 738. In addition, Cannon fails to provide appropriate record citations for his assertions. He cites, for example, to Paragraphs 2 and 10 of his Local Rule 56.1(b)(3)(C) statement for the proposition that Massey and Whalen identified "differing reasons" for his termination, but these citations do not concern or support this proposition. With respect to Anderson, Cannon's theory is undeveloped and contradictory. On the one hand, Cannon argues that Anderson fired him "without providing any explanation." On the other hand, Cannon references Anderson's "statements," and alleges in his complaint that, on May 7, 2012, he "reported to work and after a lengthy discussion with Joe Anderson was told that he was discharged." (R.12, Compl. at ¶ 10). The fact that neither Anderson nor, seemingly, Cannon, can recall the specifics of the May 7, 2012 conversation does not render the proffered explanation inherently suspect, especially where—as discussed below—the explanation is not "so ludicrous that [Gexpro] is not to be believed." *Hitchcock*, 718 F.3d at 738. Moreover, even assuming that, on May 7, Anderson made verbal "statements" inconsistent with the explanation now proffered, Cannon still fails to identify evidence suggestive of a discriminatory or retaliatory motive. *See id.* at 740 ("Of course, a showing of pretext alone is not enough; the plaintiff must

also show that the explanations are a pretext for the prohibited animus"); *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (pretext is "a phony reason meant to cover up a disallowed reason")).

Although unclear, Cannon's "disparate reasons" theory appears to derive from conflicting evidence on *how* his employment ended. (R.35, Response Br. at 11-12). Indeed, the record establishes that Massey and Whalen both believed—based on Anderson's description of his May 7 conversation with Cannon—that Cannon had quit because he would not agree to the employment expectations outlined during the May 4 meeting. Cannon disputes quitting, and disputes ever "voic[ing] any refusal to meet [the] expectations of his employment at Gexpro." (R.39-5, Cannon Aff. at ¶ 15). Contrary to Cannon's suggestion, however, this "fired-versus-quit" dispute does not raise a triable issue of fact as to whether Gexpro violated Title VII or Section 1981. *See Bordelon*, 811 F.3d at 989 ("The mere existence of *some* alleged factual dispute will not defeat summary judgment"); *Anderson*, 477 U.S. at 248 ("the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party").

Viewing the record in the light most favorable to Cannon, *Chaib*, 819 F.3d at 341, Anderson fired Cannon—without the benefit of the contemplated "sit-down" with Massey, and without formal authorization from Whalen—on May 7, 2012. Anderson then discussed the situation with Massey and Whalen, implying that Cannon had quit because he refused to improve his workplace behavior. Anderson later executed the May 10 Termination Letter "to inform [Cannon] of [his] termination of employment from Gexpro," noting, in part, that "[Gexpro] went through a detailed account of your improvement needs [on] Friday, May 4, 2012 and you did not agree to make the necessary improvements." (R.31-16). Even assuming the falsity of this latter statement—and assuming that Anderson, accordingly, misled Whalen and Massey on this

point—the record *still* does not permit the inference that "the motive of [Anderson's] deliberate decision to mislead was to conceal unlawful race discrimination." *Lane*, 835 F.3d at 697. In other words, even assuming that Anderson's statement to Massey and Whalen was "deliberately false," Cannon has offered no additional, corroborative evidence from which a reasonable juror "could infer further that [Anderson] was lying to cover up a retaliatory motive." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 574 (7th Cir. 2015). Here, again, Cannon's lack of evidence bearing on a discriminatory or retaliatory motive is fatal to his claims. Accordingly, Cannon's "disparate reasons" theory does not allow him to survive summary judgment. *See Lane*, 835 F.3d at 697.

**B.** **Gexpro's Failure to Offer Cannon a PIP for a "Single Performance Issue"**

Cannon next argues that a factual dispute exists concerning whether there was "any proper basis to terminate Cannon for a single performance issue[.]" (R.35, Response Br. at 12). He further contends that Gexpro, "at the very least," should have placed him on a PIP if the May 2 Notice was "sincere" instead of "pretext for racial discrimination and retaliation[.]" (R.39-5, Cannon Aff. ¶¶ 16-17).

As discussed above, however, this variation of Cannon's "suspicious timing" and "progressive discipline" arguments ignores record evidence from May 2-4, 2012, and fails to raise the inference of discrimination. It likewise does not establish pretext, even viewing the evidence in the light most favorable to Cannon. *See Fane*, 480 F.3d at 541 ("Essentially, Fane's progressive discipline argument is a claim that her employer overreacted to her behavior – not that the firm fired her under false pretenses"); *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) ("it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee"); *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir.

2012) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge").

Here, in addition to Cannon's unwillingness to meet job expectations—which Cannon now disputes—the May 10 Termination Letter outlined other reasons for Cannon's discharge, namely:  "Following the disciplinary action on May 2, 2012 you continued to be disrespectful to peers and insubordinate to the Warehouse Supervisors and [Anderson]."  (R.31-16).  Cannon does not dispute his behavior following the May 2 Notice, (R.32, Rule 56.1(a)(3) Stmt. Facts ¶¶ 24-29), and has made no showing that Gexpro did not "honestly believe" that such behavior warranted termination, despite his otherwise positive performance record.  This explanation, moreover, is not "so ludicrous that [Gexpro] is not to be believed."  *Hitchcock*, 718 F.3d at 738; *see also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("Arguably, the hospital overreacted and unnecessarily fired an employee with an otherwise competent performance record.  Nevertheless . . . We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation") (citation and quotation omitted).

C.    **The Pretext Determination**

Finally, even assuming that the "fired-versus-quit" dispute (i) calls into question the validity of Gexpro's human resources' review and approval of Cannon's termination, and (ii) represents such a "weakness" in Gexpro's *entire* explanation as to render that explanation, as a whole, "unworthy of credence," *see Fane*, 480 F.3d at 541, Cannon's case does not surmount summary judgment.  Construing the record in Cannon's favor, Anderson mishandled Cannon's discharge.  He did not sit down with Massey and Cannon to continue their May 4 discussion, and he did not seek appropriate approval from Whalen.  He then misrepresented the circumstances of

Cannon's departure to both Massey and Whalen. In reviewing Cannon's ADR submissions, Massey and Whalen remained under the mistaken impression that Cannon had not agreed to meet Gexpro's employment expectations, rendering the ADR process suspect. Ultimately, Gexpro discharged Anderson after he opted out of PIP participation. While these facts may speak to Anderson's personal distaste for Cannon, and his deliberate misrepresentation to Gexpro, they do not "support the further inference of unlawful intent." *Lane*, 835 F.3d at 697. And, as in *Lane*, "the rest of the support here is just too weak to allow a reasonable inference of discrimination." *Id.*

In considering the present motion, the Court focuses on "the sole question that matters: Whether a reasonable juror could conclude that [Cannon] would have kept his job if he had a different [race], and everything else had remained the same." *Ortiz*, 834 F.3d at 764; *Williams*, 839 F.3d at 626; *Lane*, 835 F.3d at 695. Here, there is simply not sufficient evidence of a discriminatory or retaliatory motive for a reasonable factfinder to rule in favor of Cannon. This is true even applying the "mixed-motive" theory urged by Cannon. *See Grigsby*, 628 F.3d at 360 ("To put forth a mixed-motive claim, Grigsby must nevertheless come forth with direct or circumstantial evidence of discrimination. As we have already noted, Grigsby lacks direct or circumstantial evidence of discrimination, so his mixed-motive claim fails for this reason alone").[10] The Court, accordingly, finds in favor of Gexpro on its motion for summary judgment.

---

[10] Cannon cites to the Eleventh Circuit's decision in *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016), for the proposition that such decision "makes trial more readily available for a plaintiff alleging a mixed-motive theory in a Title VII discrimination setting." (R.35, Response Br. at 9-10). *Quigg* is not binding authority and, in any event, it does not alter the outcome of the Court's analysis. *See Quigg*, 814 F.3d at 1240 (requiring the plaintiff "to show only that a genuine issue of material fact exists as to whether an illegal reason was a motivating factor in an adverse employment action"). The *Quigg* inquiry, in essence, asks "whether a reasonable jury could find prohibited discrimination." *Bass*, 746 F.3d at 840. Here, Cannon has failed to meet that burden.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion for summary judgment and dismisses this case with prejudice.

**Dated:**   December 19, 2016

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge